# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### 21-61644-CV-SINGHAL/VALLE

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **MJ CAPITAL FUNDING, LLC,** | ) |
| **MJ TAXES AND MORE INC, and** | ) |
| **JOHANNA M. GARCIA,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

FILED BY _____ D.C.

AUG 09 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND
## DEMAND FOR JURY TRIAL

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## I. INTRODUCTION

1.      For over a year, Johanna M. Garcia has been running a Ponzi scheme, using her companies to take in between $70.9 million and $128.8 million from over 2,150 investors—who have been tricked into thinking they are funding loans to small businesses—when in reality their outsize annualized "returns" of 120% – 180% have been funded with money obtained from new investors.   Among other relief, the Commission requests that the Court issue a Temporary Restraining Order and Preliminary Injunction to halt this ongoing scheme, freeze the assets of Garcia and her companies, MJ Capital Funding, LLC ("MJ Capital") and MJ Taxes and More Inc. ("MJ Taxes" and, with MJ Capital, the "MJ Companies"), and appoint a receiver over the MJ Companies.

2.      Since at least June 2020, MJ Taxes began soliciting investments, agreeing to pay annual returns of varying amounts, typically 120%, for six-month investments.

3.      By at least as early as October 2020, MJ Capital became the primary investment vehicle, representing that it would use investor money to fund small business loans called Merchant Cash Advances ("MCAs").  Between October 2020 and ongoing to the date of this Complaint, MJ Capital has promised investors an annual return of varying amounts, typically 120%.

4.      Investors enter into a written agreement with the MJ Companies, initially called a Loan Agreement and later a Merchant Cash Advance Agreement, but Defendants have not registered these securities with the Commission.

5.      With rare exceptions, the MJ Companies do not use investor funds to make MCAs, and the MJ Companies earn little revenue.  However, they have to date been able to pay the returns promised to investors (a) through a rising stream of funds from new investors, and (b) by convincing existing investors to renew their existing investments, thus deferring the MJ Companies' need to repay investors' principal.

6.      By engaging in this conduct, the MJ Companies and Garcia violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a); and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.  In the alternative, Garcia, directly or indirectly, controls the MJ Companies and is therefore, pursuant to Exchange Act Section 20(a), 15 U.S.C. § 78t(a), jointly and severally liable with the MJ Companies for their violations of Exchange Act Section 10(b) and Rule 10b-5.

## II. **DEFENDANTS**

7.      MJ Capital is a Florida limited liability company located in Pompano Beach, Florida. Garcia formed MJ Capital in June 2020 and is its Manager, an Authorized Member, and President.

MJ Capital purports to be in the business of providing merchant cash advances to businesses located in Florida and throughout the United States.  MJ Capital claims to fund millions of dollars in merchant capital loans to small business owners in exchange for a percentage of the business' income over a specified period of time, with the amount of such funding having steadily increased every month since its inception in 2020.  The total amount to be repaid is supposedly calculated by a factor rate, a multiplier generally based on a business' financial status.

8.      MJ Taxes is a Florida corporation located in the same office as MJ Capital in Pompano Beach.  Garcia incorporated MJ Taxes in December 2016 as MJ Tax Services & More Inc. and is its President.  In March 2020, Garcia changed the company's name to MJ Taxes and More Inc.

9.      Garcia is a resident of North Lauderdale, Florida.  Garcia controls the MJ Companies.

### III. JURISDICTION AND VENUE

10.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b) and 77v(a); and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

11.     This Court has personal jurisdiction over Defendants, and venue is proper in the Southern District of Florida, because many of Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Florida, where Defendants reside and conduct business.

12.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## IV.  **DEFENDANTS' FRAUDULENT SCHEME**

**A.     The Securities Offering:  The MJ Companies Raise Tens of Millions From Investors Falsely Representing that the Monies Would be Used to Fund MCAs**

13.     Since at least June 2020, MJ Taxes solicited investments, typically promising 10% monthly returns (an annual rate of 120%) for six-month investments.

14.     In written agreements with investors executed between June 2020 and September 2020, signed by Garcia on behalf of MJ Taxes, the investor is referred to as "Investor" or "Lender" and MJ Taxes is referred to as the "Facilitator" or "Borrower."

15.     On   July   29,   2020,   MJ   Capital   registered   the   domain   name www.mjcapitalfunds.com (the "Website").

16.     Beginning in or around October 2020, MJ Capital became the primary vehicle for raising funds from investors.

17.     MJ Capital entered into written agreements with investors.  The agreements refer to the investor as the "Purchaser," and MJ Capital agrees that it will use the investor's money to fund an MCA.  MJ Capital promises an annual return of varying amounts, typically 120%, with MJ Capital guaranteeing repayment of principal if the merchant defaults.   The term of the investment is either six months, 9 months, 12 months or six months with an option by the investor to extend the term for an additional six months.

18.     In addition to the written agreement, MJ Capital requires investors to sign:  a Non-Disclosure Agreement, where the investor would agree not to disclose confidential information about MJ Capital; a Purchaser Non-Compete Agreement, where the investor would agree not to engage in any business that would compete with MJ Capital for two years; an IRS W-9 form; and a Referral Program Agreement, which allows an investor to receive a one-time referral bonus of an unspecified amount for each referred person who invests with MJ Capital.

19.    The Website makes various representations that MJ Capital is in the business of funding MCAs and that investor money would be used for this purpose.

20.    The Website provides background information on how MJ Capital can assist small businesses with merchant cash advances and further invites business owners to fill out an online application for funding.

21.    At least as early as November 26, 2020, the Website's homepage was entitled "Custom Merchant Cash Advance Programs" and stated that MJ Capital offers "Quick Approvals," "Fast Funding," and "Flexible Terms."

22.    At least as early as December 5, 2020, the Website stated that MJ Capital could provide "an alternative option to satisfy a business's financial needs," that no collateral was required, and that funding could occur within 72 hours.

23.    At least as early as January 26, 2021, the Website stated that MJ Capital had a "pipeline of investors," from whom the business could expect "cash of up to $200,000 to fulfill [its] needs . . . ."

24.    Since at least as early as March 6, 2021, the Website has included a link to a one minute, twenty second video (also available on MJ Capital's Instagram IGTV page) entitled "The Story of PFR."  According to the video, a PFR ("Purchasing Future Receivables") is "a purchase agreement that produces positive returns on the future revenues of small and midsize businesses." The video narration describes an investor, "John" (described in the video as a "purchaser") "who was looking for an opportunity to create wealth."  The video states that John "looked at the stock market, real estate, and mutual funds and realized they were not the right fit for him."  The video then describes "Pablo," a plumbing contractor who was awarded a large contract but needed upfront capital to fulfill it and could not get a bank loan.  The video then shows John and Pablo

coming together, with John providing funds to Pablo and receiving monthly profits and the return of principal. The video then states: "John's happy, Pablo's happy, you're happy—because you're going to start purchasing PFR's today." The video concludes with the logo for MJ Capital and the narration: "MJ Capital: Purchase Future Receivables; Start Creating Wealth Today." The video continues to appear on the Website and on Instagram as of August 4, 2021.

25.     At least as early as May 12, 2021, the Website's "blog" section states that Garcia is "often referred to as 'Mother Theresa'" in her community, that she found a way to help hardworking individuals make money, and that she helps her merchant clients get the financing they need. It also states: "[MJ Capital] has grown to an extent where there is a team of underwriters who qualify every company that seeks funds from MJ Capital. There are no exceptions to this! The process consists of checking 6 months' worth of bank statements, last year's tax returns, and [the merchant's] profit and loss sheet for the last year."

26.     Additionally, at least as early as May 12, 2021, MJ Capital has represented through social media that it is in the business of funding MCAs and offers "quick approvals," "fast funding," "flexible terms" and "help[s] small businesses". Its Twitter page touts: "MJ Capital specializes in MCA funding for businesses, our goal is to help you and your business thrive during uncertain times by working with our team." In addition to the Website and social media, MJ Capital solicits investors through its own employees, external sales agents (who have been paid at least $27.4 million to date), and word-of-mouth. Whatever the form of solicitation, the message is the same: MJ Capital will use the investor's money to fund MCAs and the investor will receive periodic payments at high rates of return.

27.     MJ Capital's solicitation and receipt of investor funds is ongoing.

28.     In or around June 2021, an undercover Federal Bureau of Investigation agent ("UC") posing as a prospective investor visited MJ Capital's office in Pompano Beach.  The UC spoke with MJ Capital's office manager, who explained MJ Capital would use the UC's funds to purchase future sales or profits of companies and, in return, the UC would make a 10% monthly return.  The office manager explained that an underwriting team determines a merchant's ability to repay by requiring two years of tax returns and that MJ Capital has liens on a merchant's projects as further security.  The office manager further stated that MJ Capital's representatives are paid by commission.

29.     In or around June 2021, the UC returned to MJ Capital's office, meeting this time with a different MJ Capital representative.  The UC agreed to and eventually did make a $10,000 investment for a twelve-month term at a 10% monthly interest rate.  The UC and the representative signed a Merchant Cash Advance Agreement, which Garcia notarized.

30.     In July 2021, MJ Capital made its first interest payment to the UC.

31.     Between May 1 and June 30, 2021, the MJ Companies have raised between $19.8 million and 61.6 million.

32.     The Loan Agreements and Merchant Cash Advance Agreements are investment contracts.  Investors looked solely to the MJ Companies to produce returns, and the MJ Companies' ability to do so depended entirely on their ability to either fund profitable MCAs or attract new investors to cover payments to existing investors.  The Agreements are also notes.  As investment contracts and/or notes, the Agreements are securities within the meaning of the Securities Act and the Exchange Act.

**B.     The Reality:  The MJ Companies Make Very Few MCAs, Have Little Revenue and Fund Investor Returns Primarily With Monies Raised from New Investors, and Defendants Misused and Misappropriated Investor Funds**

33.     The representations that the MJ Companies were using investor money to fund MCAs and that their money was secure were lies.  In fact, the MJ Companies made very few MCAs, they did not file liens in connection with the few MCAs they did make, and investors' ability to receive the promised returns and repayment of principal was dependent on Defendants' ability to continue to raise new investor money and convince existing investors to extend the term of their agreements.

34.     For the period June 1, 2020 through April 30, 2021, the MJ Companies received between $51.1 million and $67.2 million in investor funds from investors in Florida and several other states.  However, the MJ Companies made at most $2.9 million in MCAs, consisting of approximately $588,561 where there is some affirmative indication that the payment from the MJ Companies to a business was to fund an MCA, and another $2.3 million where based on currently available information, the making of an MCA cannot be ruled out.

35.     Moreover, from June 1, 2020 through April 30, 2021, the MJ Companies misused investor funds by making payments totaling approximately $27.4 million to various entities, a substantial portion of which represent payments to sales agents for promoting the investments in the MJ Companies.  The MJ Companies also misused investor funds by making payments on loans owed by MJ Taxes via transfers to MJ Taxes' bank account.

36.     Garcia misappropriated investor funds through cash withdrawals.

37.     Because the MJ Companies made few MCAs and were diverting substantial investor money, the MJ Companies were not earning anywhere near the revenue needed to pay the promised returns to investors.

38.     From June 1, 2020 through April 30, 2021, the MJ Companies have paid at least $20 million in purported returns to investors and possibly another $9.3 million. However, instead of paying investors out of the revenue of the business, the MJ Companies have used new investor money to pay returns to existing investors.

39.     The investments in the MJ Companies were not secure. To the contrary, the only way the MJ Companies could honor their obligations to investors would be by successful continuation of their fraudulent scheme. Once the supply of new investors was exhausted, the MJ Companies would be unable to pay the promised returns to existing investors.

**C.     The Cover-Up: MJ Capital Makes False Statements in Response to Allegations that it is a Ponzi Scheme**

40.     On or about April 10, 2021, an individual registered a domain name very similar to the Website and published content alleging that MJ Capital was operating a Ponzi scheme. Among other things, the new website questions how MJ Capital can pay such high rates of return and how it makes its money.

41.     These allegations were problematic for MJ Capital, and it responded by posting on the Website "a Response to False Claims by Unknown Individual." Among other things, in the response, MJ Capital states that it "specializes in MCA's" without disclosing that it makes very few MCAs and that the vast majority of its business consists of raising money from investors.

42.     MJ Capital also responded to the allegations by suing the individual who had created the website (and was apparently demanding money from MJ Capital). According to a Complaint MJ Capital filed on April 19, 2021 in the United States District Court for the Southern District of Florida (*MJ Capital Funding, LLC v. Doe*, No. 0:21-cv-60841-AHS) (the "Complaint"), MJ Capital had "received no less than 15-20 inquiries from merchants, employees, and other persons with respect to the [Ponzi] allegations . . . and has lost substantial business as a result . . . ."

The Complaint further stated that as a result of these allegations, MJ Capital had "lost profits from merchants/investors who were steered away from doing business with [MJ Capital] . . . ."

43.     In the Complaint, MJ Capital makes a number of false or materially misleading statements.  Specifically, the Complaint alleges that MJ Capital:

a.     is "in the business of providing [MCAs] to businesses located in Florida and throughout the United States";

b.     "has rapidly developed a loyal following" among its MCA customers;

c.     has "relationships with several key funding partners (who provide investment monies that are then used to provide the subject merchant cash advances)";

d.      "does not operate a Ponzi scheme";

e.      "does not . . . offer 'guaranteed returns on investment.'";

f.     "maintains a small number of investors"; and

g.     "enters into written contractual agreements with both its investors and the merchants receiving cash advances – the investors receive a satisfactory return on their investment and the merchants receive needed financing for their operations."

44.     On July 29, 2021, Garcia filed in the lawsuit a declaration under penalty of perjury (the "Declaration").  In the Declaration, Garcia repeats the statements described in paragraph 43a-43c.  She goes on to state that MJ Capital "funds millions of dollars in merchant capital loans on a monthly basis."

45.     These statements in the Complaint (and repeated in the Amended Complaint) and the Declaration are false and materially misleading.  Making MCAs was a trivial part of MJ

Capital's business, and investor funds were used for the most part not to fund MCAs but rather to make payments to earlier investors. There were not just "several" or a "small number of investors"—there were more than 2,150. And MJ Capital did guarantee that if the (non-existent) merchant defaulted, MJ Capital would repay the investors' principal.

46.    MJ Capital's cover-up efforts were successful, and in the months after the appearance of the website accusing MJ Capital of operating a Ponzi scheme, MJ Capital continued to raise ever-increasing amounts of investor money.

## V.  CLAIMS FOR RELIEF

## COUNT 1

## Sections 5(a) and (c) of the Securities Act

47.    The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

48.    No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions issued by the MJ Companies described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

49.    From at least as early as June 2020 and continuing to the date of this Complaint. Defendants, directly and indirectly:

(a)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

(b)    carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

50.     By reason of the foregoing Defendants violated and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT 2

### Section 17(a)(1) of the Securities Act

51.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

52.     Defendants, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes, or artifices to defraud.

53.     By reason of the foregoing, Defendants directly or indirectly violated Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT 3

### Section 17(a)(2) of the Securities Act

54.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

55.     Defendants, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

56.     By reason of the foregoing, Defendants directly or indirectly violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT 4

### Section 17(a)(3) of the Securities Act

57.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

58.     Defendants, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

59.     By reason of the foregoing, Defendants directly or indirectly violated Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT 5

### Section 10(b) and Rule 10b-5(a) of the Exchange Act

60.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

61.     Defendants, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

62.     By reason of the foregoing, Defendants directly or indirectly violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

## COUNT 6

### Section 10(b) and Rule 10b-5(b) of the Exchange Act

63.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

64.     Defendants, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material

facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

65.     By reason of the foregoing, Defendants directly or indirectly violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## COUNT 7

### Section 10(b) and Rule 10b-5(c) of the Exchange Act

66.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

67.     Defendants, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices, and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

68.     By reason of the foregoing, Defendants directly or indirectly violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

## COUNT 8

### Control Person Liability Under Section 20(a) of the Exchange Act
### (Against Garcia)

69.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

70.     At all relevant times, Garcia has been, directly or indirectly, a control person of the MJ Companies for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

71.     As alleged in this Complaint, the MJ Companies violated Section 10(b) and Rule 10b-5 of the Exchange Act.

72.     As a control person of the MJ Companies, Garcia is jointly and severally liable with and to the same extent as the MJ Companies for their violations of Section 10(b) and Rule 10b-5 of the Exchange Act.

## VI.  **RELIEF REQUESTED**

**WHEREFORE**, the Commission respectfully requests that the Court find that Defendants committed the violations of the federal securities laws alleged herein and

### A.     **Temporary Restraining Order, Preliminary and Permanent Injunctive Relief**

Issue a Temporary Restraining Order and Preliminary and Permanent Injunctions restraining and enjoining Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### B.     **Disgorgement**

Issue an Order directing Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint,

### C.     **Civil Penalty**

Issue an Order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d).

### D.     **Sworn Accounting**

Issue an Order directing Defendants to provide a sworn accounting of all proceeds received resulting from the acts and/or courses of conduct alleged in this Complaint.

### E.     **Asset Freeze**

Issue an Order freezing the assets of Defendants, until further Order of the Court.

**F.**     **Appointment of a Receiver**

Appoint a receiver over the MJ Companies.

**G.**     **Officer and Director Bar**

Issue an Order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), barring Defendant Garcia from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

**H.**     **Records Preservation**

Issue an Order restraining and enjoining Defendants, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, brochures, manuals, papers, ledgers, accounts, statements, obligations, files and other property of or pertaining to Defendants wherever located and in whatever form, electronic or otherwise, that refer, reflect or relate to the acts or courses of conduct alleged in this Complaint, until further Order of this Court.

**I.**     **Expedited Discovery**

Issue an Order expediting discovery for the Commission to take during the period between issuance of a temporary restraining order and the hearing on the issuance of a preliminary injunction.

**J.**     **Further Relief**

Grant such other and further relief as may be necessary and appropriate.

**K.      Retention of Jurisdiction**

Retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

**L.      Demand for Jury Trial**

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

August 9, 2021

Respectfully submitted,

By:    /s/
Stephanie N. Moot
Senior Trial Counsel
Fla. Bar No. 30377
Direct Dial: (305) 982-6313
Email:  moots@sec.gov

Andrew O. Schiff
Regional Trial Counsel
S.D. Fla. No. A5501900
Direct Dial: (305) 982-6390
Email:  schiffa@sec.gov

Raynette R. Nicoleau
Fla. Bar No. 278210
Senior Counsel
Direct Dial: (305) 982-6308
Fax: (305) 536-4154

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE
COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone:  (305) 982-6300
Facsimile:  (305) 536-4146