

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

---

### 21-61644-CV-SINGHAL/VALLE

---

**SECURITIES AND EXCHANGE COMMISSION,**   )
                    )
           **Plaintiff,**   )
                    )
**v.**   )
                    )
**MJ CAPITAL FUNDING, LLC,**   )
**MJ TAXES AND MORE INC., and**   )
**JOHANNA M. GARCIA,**   )
                    )
          **Defendants.**   )
                    )

---

### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND OTHER RELIEF AND SUPPORTING MEMORANDUM OF LAW

## I.   INTRODUCTION

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") moves this Court for a Temporary Restraining Order, Asset Freeze, and Other Emergency Relief pursuant to Rule 65 of the Federal Rules of Civil Procedure ("TRO Motion") and Local Rule 7.1 to prevent Defendants MJ Capital Funding, LLC ("MJ Capital"), MJ Taxes and More, Inc. ("MJ Taxes," together with MJ Capital, the "MJ Companies"), and Johanna M. Garcia ("Garcia") (collectively, "Defendants") from continuing to defraud investors in connection with their fraudulent offer and sale of securities, and to prevent them from further misuse and misappropriation of investor funds.

The Commission requests the following relief:

1. a Temporary Restraining Order;

2. an Order to Show Cause Why a Preliminary Injunction Should Not be Granted;

3. an Order Freezing the assets of Defendants MJ Capital, MJ Taxes, and Garcia; and

4. an Order Requiring Sworn Accountings, Document Preservation and Expedited Depositions.

A proposed order encompassing all of the requested relief is attached. (In a separate motion filed contemporaneously herewith, the Commission also seeks the appointment of a receiver over the MJ Companies.)

## II.   <u>OVERVIEW OF THE FRAUD AND NEED FOR EMERGENCY RELIEF</u>

From at least June 2020 and continuing through the present, MJ Capital, its affiliated company MJ Taxes, and their founder, chief executive officer, and president Garcia, have raised between $70.9 million and $128.6 million from more than 2,150 investors across the United States through an unregistered fraudulent securities offering. Defendants solicit and raise money from investors through several means, including the websites and social media accounts for MJ Capital and MJ Taxes, their employees, external sales agents, and word-of-mouth.

Defendants represent to investors and prospective investors that investor funds will be used to provide merchant cash advances ("MCAs") to small and medium-sized businesses. In exchange, Defendants promise investors they will receive monthly returns of varying amounts, typically 10% per month, along with the return of their principal.

Contrary to Defendants' representations, our bank analysis from June 1, 2020 through June 30, 2021 reveals that only a small portion of investor proceeds was used to make MCAs. Instead, Defendants used the majority of investor funds to make interest and principal payments to other investors in classic Ponzi fashion. Additionally, Defendants diverted investor funds to pay commissions to sales agents promoting investment in the MJ Companies and to repay loans owed by MJ Taxes. Garcia also misappropriated investor assets through cash withdrawals.

Through their ongoing conduct, Defendants have violated and are continuing to violate the registration and anti-fraud provisions of the federal securities laws.  Based on the ongoing nature of their violations and scienter, Defendants have demonstrated through their willful and wanton disregard for the federal securities laws that they will continue to defraud investors unless the Court grants the injunctive and other emergency relief the Commission seeks.

Immediate relief is needed because Defendants' fraudulent solicitations continue today. Indeed, the MJ Companies raised between $19.8 million and $61.6 million between May 1 and June 30, 2021, and their respective websites and social media accounts remain accessible to the public.

We also seek to freeze Defendants' assets.  Defendants control a number of bank accounts that received and may still contain proceeds of the fraudulent scheme.  We are seeking a freeze on those accounts to prevent Defendants from dissipating fraudulently-obtained funds, and to preserve funds to satisfy a potential judgment.

## III.   FACTS

### A.   Defendants

**MJ Capital** is a Florida limited liability company located in Pompano Beach, Florida.[1] Garcia formed MJ Capital in June 2020 and is its Manager, an Authorized Member, and President.[2] MJ Capital purports to be in the business of providing merchant cash advances to businesses located in Florida and throughout the United States.[3]  MJ Capital claims to fund millions of dollars in merchant capital loans to small business owners in exchange for a percentage of the business'

---

[1] Ex. 1, MJ Capital Florida corporate filing at p. 2.
[2] *Id.* at pp. 3, 7; Ex. 2, *MJ Capital Funding, LLC v. Doe*, No. 0:21-cv-60841-AHS (S.D. Fla.) Garcia Declaration, DE 22-2 at ¶¶2-3.
[3] *Id.* at ¶3.

income over a specified period of time, with the amount of such funding having steadily increased

every month since its inception in 2020.[4]  The total amount to be repaid is supposedly calculated

by a factor rate, a multiplier generally based on a business' financial status.[5]

   **MJ Taxes** is a Florida corporation located in the same office as MJ Capital in Pompano

Beach.[6]  Garcia incorporated MJ Taxes in December 2016 as MJ Tax Services & More Inc. and is

its President.[7]  In March 2020, Garcia changed the company's name to MJ Taxes and More Inc.[8]

   **Garcia** is a resident of North Lauderdale, Florida.[9]  Garcia controls the MJ Companies.[10]

**B.**     **Jurisdiction and Venue**

   This Court has personal jurisdiction over Defendants, and venue is proper in the Southern

District of Florida.  MJ Capital and MJ Taxes maintain an office in Pompano Beach, Florida, and

Garcia resides in North Lauderdale, Florida.[11]  As of June 30, 2021, Defendants raised between

$70.9 million and $128.8 million from investors, including those residing in this district.[12]

**C.**     **Defendants' Fraudulent Scheme**

   **1.      The Securities Offering:  The MJ Companies Raise Tens of Millions
            From Investors Falsely Representing that the Monies Would be Used
            to Fund MCAs**

   Since at least June 2020, MJ Taxes solicited investments, typically promising 10% monthly

returns (an annual rate of 120%) for six-month investments.[13]

---

[4] *Id*. at ¶¶3, 32.
[5] *Id*. at ¶3.
[6] Ex. 3, MJ Taxes Florida corporate filing at pp. 2, 13.
[7] *Id*. at pp. 2-3.
[8] *Id*. at p. 9.
[9] *Id*. at p. 13.
[10] *See supra* n. 1, 2, 6.
[11] *See supra* n. 1, 6, 9.
[12] Ex. 4, Declaration of Julia D'Antonio ("D'Antonio Decl.") at ¶¶12(a), 51(a).
[13] *Id*. at ¶12(a); Ex. 5, June 2020 "Loan Agreement."

In written agreements with investors executed between June 2020 and September 2020, signed by Garcia on behalf of MJ Taxes, the investor is referred to as "Investor" or "Lender" and MJ Taxes is referred to as the "Facilitator" or "Borrower."[14]

On July 29, 2020, MJ Capital registered the domain name www.mjcapitalfunds.com (the "Website").[15]

Beginning in or around October 2020, MJ Capital became the primary vehicle for raising funds from investors.[16]

MJ Capital entered into written agreements with investors.[17]  The agreements refer to the investor as the "Purchaser," and MJ Capital agrees that it will use the investor's money to fund an MCA.[18]  MJ Capital promises an annual return of varying amounts, typically 120%, with MJ Capital guaranteeing repayment of principal if the merchant defaults.[19]  The term of the investment is either 6 months, 9 months, 12 months[20] or 6 months with an option by the investor to extend the term for an additional 6 months.[21]

In addition to the written agreement, MJ Capital requires investors to sign:  a Non-Disclosure Agreement, where the investor would agree not to disclose confidential information about MJ Capital; a Purchaser Non-Compete Agreement, where the investor would agree not to engage in any business that would compete with MJ Capital for two years; an IRS W-9 form; and

---

[14] Ex. 5; Ex. 6, July 2020 "Loan Agreement"; Ex. 7, September 2020 "Loan Agreement."
[15] Ex. 2 at ¶5.
[16] Ex. 8, October 2020 sample "Merchant Cash Advanced Agreement"; Ex. 9, April 2021 "Merchant Cash Advance Agreement"; Ex. 10, June 2021 "Merchant Cash Advance Agreement."
[17] Ex. 9, 10.
[18] Id.
[19] Id. at ¶7.
[20] Ex. 11, New Contract Intake Form; Ex. 9, 10.
[21] Ex. 9, 10 at ¶6.

a Referral Program Agreement, which allows an investor to receive a one-time referral bonus of an unspecified amount for each referred person who invests with MJ Capital.[22]

The Website makes various representations that MJ Capital is in the business of funding MCAs and that investor money would be used for this purpose.[23]

The Website provides background information on how MJ Capital can assist small businesses with merchant cash advances and further invites business owners to fill out an online application for funding.[24]

At least as early as November 26, 2020, the Website's homepage was entitled "Custom Merchant Cash Advance Programs" and stated that MJ Capital offers "Quick Approvals," "Fast Funding," and "Flexible Terms."[25]

At least as early as December 5, 2020, the Website stated that MJ Capital could provide "an alternative option to satisfy a business's financial needs," that no collateral was required, and that funding could occur within 72 hours.[26]

At least as early as January 26, 2021, the Website stated that MJ Capital had a "pipeline of investors," from whom the business could expect "cash of up to $200,000 to fulfill [its] needs . . . ."[27]

Since at least as early as March 6, 2021, the Website has included a link to a one minute, twenty second video (also available on MJ Capital's Instagram IGTV page) entitled "The Story of

---

[22] Composite Ex. 12, Non-Disclosure Agreement, Purchaser Non-Compete Agreement, IRS W-9 form, Referral Program Agreement; Ex. 13, Declaration of Raymond Andjich ("Andjich Decl.") at ¶14.
[23] Ex. 14, May 12, 2021 MJ Capital website capture and attestation.
[24] *Id.*
[25] Ex. 15, November 26, 2020 MJ Capital archived website capture at p. 1 and attestation.
[26] Ex. 16, December 5, 2020 MJ Capital archived website capture at p. 1 and attestation.
[27] Ex. 17, January 26, 2021 MJ Capital archived website capture at p. 1 and attestation.

PFR."[28]   According to the video, a PFR ("Purchasing Future Receivables") is "a purchase agreement that produces positive returns on the future revenues of small and midsize businesses."[29] The video narration describes an investor, "John" (described in the video as a "purchaser") "who was looking for an opportunity to create wealth."[30]  The video states that John "looked at the stock market, real estate, and mutual funds and realized they were not the right fit for him."[31]  The video then describes "Pablo," a plumbing contractor who was awarded a large contract but needed upfront capital to fulfill it but could not get a bank loan.[32]  The video then shows John and Pablo coming together, with John providing funds to Pablo and receiving monthly profits and the return of principal.[33]  The video then states:  "John's happy, Pablo's happy, you're happy—because you're going to start purchasing PFR's today."[34]  The video concludes with the logo for MJ Capital and the narration:  "MJ Capital:  Purchase Future Receivables; Start Creating Wealth Today."[35] The video continues to appear on the Website[36] and on Instagram[37] as of August 4, 2021.

At least as early as May 12, 2021, the Website's "blog" section states that Garcia is "often referred to as 'Mother Theresa'" in her community, that she found a way to help hardworking individuals make money, and that she helps her merchant clients get the financing they need.[38]  It also states:  "[MJ Capital] has grown to an extent where there is a team of underwriters who qualify

---

[28] Ex. 18, March 6, 2021 MJ Capital archived website capture at p. 1 and attestation.
[29] Ex. 19, Transcript of video on MJ Capital's website.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] Ex. 20, August 4, 2021 MJ Capital website capture and attestation.
[37] Ex. 21, August 4, 2021 MJ Capital Instagram capture and attestation.
[38] Ex. 14 at pp. 14-15.

every company that seeks funds from MJ Capital.  There are no exceptions to this!  The process consists of checking 6 months' worth of bank statements, last year's tax returns, and [the merchant's] profit and loss sheet for the last year."[39]

Additionally, at least as early as May 12, 2021, MJ Capital has represented through social media that it is in the business of funding MCAs and offers "quick approvals," "fast funding," "flexible terms" and "help[s] small businesses".[40]  Its Twitter page touts: "MJ Capital specializes in MCA funding for businesses, our goal is to help you and your business thrive during uncertain times by working with our team."[41]  In addition to the Website and social media, MJ Capital solicits investors through its own employees,[42] external sales agents (who have been paid at least $27.4 million to date),[43] and word-of-mouth.[44]  Whatever the form of solicitation, the message is the same:  MJ Capital will use the investor's money to fund MCAs and the investor will receive periodic payments at high rates of return.[45]

MJ Capital's solicitation and receipt of investor funds is ongoing.[46]

In or around June 2021, an undercover Federal Bureau of Investigation agent ("UC") posing as a prospective investor visited MJ Capital's office in Pompano Beach.[47]  The UC spoke with MJ Capital's office manager, who explained MJ Capital would use the UC's funds to purchase future sales or profits of companies and, in return, the UC would make a 10% monthly return.[48]

------

[39] *Id*. at p. 15.
[40] Ex. 22, May 12, 2021 MJ Capital Instagram capture and attestation.
[41] Ex. 23, May 12, 2021 MJ Capital Twitter capture and attestation.
[42] Ex. 13, Andjich Decl. at ¶¶15-16.
[43] Ex. 4, D'Antonio Decl. at 15(f).
[44] Ex. 13, Andjich Decl. at ¶¶15-16.
[45] *See supra* n. 16, 23, 25-28, 38, 40-41; Ex. 13, Andjich Decl. at ¶¶15-16.
[46] Ex. 4, D'Antonio Dec. at ¶51(a); Ex. 13, Andjich Decl. at ¶¶15-16.
[47] Ex. 13, Andjich Decl. at ¶15.
[48] *Id*.

The office manager explained that an underwriting team determines a merchant's ability to repay by requiring two years of tax returns and that MJ Capital has liens on a merchant's projects as further security.[49]  The office manager further stated that MJ Capital's representatives are paid by commission.[50]

In or around June 2021, the UC returned to MJ Capital's office, meeting this time with a different MJ Capital representative.[51]  The UC agreed to and eventually did make a $10,000 investment for a twelve-month term at a 10% monthly interest rate.[52]  The UC and the representative signed a Merchant Cash Advance Agreement, which Garcia notarized.[53]

In July 2021, MJ Capital made its first interest payment to the UC.[54]

Between May 1 and June 30, 2021, the MJ Companies have raised at between $19.8 million and 61.6 million from investors.[55]

> ### 2.   The Reality:  The MJ Companies Make Very Few MCAs, Have Little Revenue and Fund Investor Returns Primarily With Monies Raised from New Investors, and Defendants Misused and Misappropriated Investor Funds

The representations that the MJ Companies were using investor money to fund MCAs and that their money was secure were lies.[56]  In fact, the MJ Companies made very few MCAs,[57] they did not file liens in connection with the few MCAs they did make,[58] and investors' ability to receive the promised returns and repayment of principal was dependent on Defendants' ability to continue

---

[49] *Id*.
[50] *Id*.
[51] *Id*. at ¶16.
[52] *Id*.
[53] *Id*. at ¶¶16, 18.
[54] *Id*. at ¶18.
[55] *Id*. at ¶51(a).
[56] *Id*. at Ex. A, B.
[57] *Id*. at ¶15(g), (h).
[58] Ex. 13, Andjich Decl. at ¶19.

to raise new investor money and convince existing investors to extend the term of their agreements.[59]

For the period June 1, 2020 through April 30, 2021, the MJ Companies received between $51.1 million[60] and $67.2 million in investor funds from investors in Florida and several other states.[61]   However, the MJ Companies made at most $2.9 million in MCAs, consisting of approximately $588,561[62] where there is some affirmative indication that the payment from the MJ Companies to a business was to fund an MCA, and another $2.3 million[63] where based on currently available information, the making of an MCA cannot be ruled out.

Moreover, from June 1, 2020 through April 30, 2021, the MJ Companies misused investor funds by making payments totaling approximately $27.4 million to various entities, a substantial portion of which represent payments to sales agents for promoting the investments in the MJ Companies.[64]   The MJ Companies also misused investor funds by making payments on loans owed by MJ Taxes via transfers to MJ Taxes' bank account.[65]

Garcia misappropriated investor funds through cash withdrawals.[66]

Because the MJ Companies made few MCAs and were diverting substantial investor money, the MJ Companies were not earning anywhere near the revenue needed to pay the promised returns to investors.[67]

---

[59] Ex. 4, D'Antonio Decl. at Ex. A, B.
[60] *Id.* at ¶12(a), 51(a).
[61] *Id.* at ¶12(a), 12(b), 51(a).
[62] *Id.* at ¶15(g).
[63] *Id.* at ¶15(h).
[64] *Id.* at ¶15(f).
[65] *Id.* at ¶15(c).
[66] *Id.* at ¶¶15(i).
[67] *Id.* at Ex. A, B.

From June 1, 2020 through April 30, 2021, the MJ Companies have paid at least $20 million in purported returns to investors and possibly another $9.3 million.[68]  However, instead of paying investors out of the revenue of the business, the MJ Companies have used new investor money to pay returns to existing investors.[69]

The investments in the MJ Companies were not secure.[70]  To the contrary, the only way the MJ Companies could honor their obligations to investors would be by successful continuation of their fraudulent scheme.[71]  Once the supply of new investors was exhausted, the MJ Companies would be unable to pay the promised returns to existing investors.[72]

### 3. The Cover-Up:  MJ Capital Makes False Statements in Response to Allegations that it is a Ponzi Scheme

On or about April 10, 2021, an individual registered a domain name very similar to the Website and published content alleging that MJ Capital was operating a Ponzi scheme.[73]  Among other things, the new website questions how MJ Capital can pay such high rates of return and how it makes its money.[74]

These allegations were problematic for MJ Capital, and it responded by posting on the Website "a Response to False Claims by Unknown Individual."[75]  Among other things, in the response, MJ Capital states that it "specializes in MCA's" without disclosing that it makes very few MCAs and that the vast majority of its business consists of raising money from investors.[76]

---

[68] *Id*. at ¶15(a).
[69] *Id*. at Ex. A, B.
[70] *Id*.
[71] *Id*.
[72] *Id*.
[73] Ex. 14, May 12, 2021 MJ Capital website at p. 9.
[74] *Id*. at pp. 9-10.
[75] *Id*. at p. 9.
[76] *Id*. at p. 11

MJ Capital also responded to the allegations by suing the individual who had created the website (and was apparently demanding money from MJ Capital).[77]  According to a Complaint MJ Capital filed on April 19, 2021 in the United States District Court for the Southern District of Florida (*MJ Capital Funding, LLC v. Doe*, No. 0:21-cv-60841-AHS) (the "Complaint"), MJ Capital had "received no less than 15-20 inquiries from merchants, employees, and other persons with respect to the [Ponzi] allegations . . . and has lost substantial business as a result . . . ."[78]  The Complaint further stated that as a result of these allegations, MJ Capital had "lost profits from merchants/investors who were steered away from doing business with [MJ Capital] . . . ."[79]

In the Complaint, MJ Capital makes a number of false or materially misleading statements. Specifically, the Complaint alleges that MJ Capital:

a.   "is in the business of providing [MCAs] to businesses located in Florida and throughout the United States";[80]

b.   "has rapidly developed a loyal following" among its MCA customers;[81]

c.   has "relationships with several key funding partners (who provide investment monies that are then used to provide the subject merchant cash advances)";[82]

d.    "does not operate a Ponzi scheme";[83]

---

[77] Composite Ex. 24, *MJ Capital Funding, LLC v. Doe*, No. 0:21-cv-60841-AHS (S.D. Fla.) Complaint, DE 1 and Amended Complaint, DE 10.
[78] *Id*. at ¶15.
[79] *Id*. at ¶46.
[80] *Id*. at ¶6.
[81] *Id*. at ¶11.
[82] *Id*.
[83] *Id*. at ¶42.

e.      "does not . . . offer 'guaranteed returns on investment.'";[84]

f.      "maintains a small number of investors";[85] and

g.      "enters into written contractual agreements with both its investors and the merchants receiving cash advances – the investors receive a satisfactory return on their investment and the merchants receive needed financing for their operations."[86]

On July 29, 2021, Garcia filed in the lawsuit a declaration under penalty of perjury.[87] In the Declaration, Garcia repeats the statements described in paragraphs (a)-(c) above.[88] She goes on to state that MJ Capital "funds millions of dollars in merchant capital loans on a monthly basis."[89]

These statements in the Complaint (and repeated in the Amended Complaint) and the Declaration are false and materially misleading.[90] Making MCAs was a trivial part of MJ Capital's business, and investor funds were used for the most part not to fund MCAs but rather to make payments to earlier investors.[91] There were not just "several" or a "small number of investors"— there were more than 2,150.[92] And MJ Capital did guarantee that if the (non-existent) merchant defaulted, MJ Capital would repay the investors' principal.[93]

---

[84] *Id.*
[85] *Id.* at ¶41.
[86] *Id.* at ¶43.
[87] Ex. 2, Garcia Decl.
[88] *Id.* at ¶¶3, 8
[89] *Id.* at¶ 32.
[90] Ex. 4. D'Antonio Decl. *generally.*
[91] *Id.* at Ex. A, B.
[92] *Id.* at ¶12(a).
[93] *See e.g.,* Ex. 9, April 2021 "Merchant Cash Advance Agreement" and Ex. 10, June 2021 "Merchant Cash Advance Agreement" at ¶7.

MJ Capital's cover-up efforts were successful, and in the months after the appearance of the website accusing MJ Capital of operating a Ponzi scheme, MJ Capital continued to raise ever-increasing amounts of investor money.[94]

## IV.     MEMORANDUM OF LAW

### A.     Standard for Obtaining a Temporary Restraining Order

Section 20(b) of the Securities Act, 15 U.S.C. § 77t, and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), provide that in Commission actions the Court shall grant injunctive relief upon a proper showing. *SEC v. Shiner*, 268 F. Supp. 2d 1333, 1340 (S.D. Fla. 2003). This "proper showing" has been described as "a justifiable basis for believing, derived from reasonable inquiry or other credible information, that such a state of facts probably existed as reasonably would lead the SEC to believe that the defendants were engaged in violations of the statutes involved." *SEC v. Gen. Int'l Loan Network, Inc.*, 770 F. Supp. 678, 688 (D.D.C. 1991).

The Commission is entitled to a temporary restraining order if it establishes (1) a *prima facie* case showing the Defendants have violated the securities laws, and (2) a reasonable likelihood they will repeat the wrong. *Shiner*, 268 F. Supp. 2d at 1340. The Commission appears "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Lauer*, 03-80612-CIV-MARRA, 2008 WL 4372896, *24 (S.D. Fla. Sept. 24, 2008), *aff'd*, 478 Fed. Appx. 550 (11th Cir. 2012). The Commission therefore faces a lower burden than a private litigant when seeking an injunction, and need not meet the requirements for an injunction imposed by traditional equity jurisprudence. *Hecht Co. v. Bowles,* 321 U.S. 321, 331 (1944); *SEC v. J.W. Korth & Co.*, 991 F. Supp. 1468, 1472 (S.D. Fla. 1998). Unlike private litigants, the Commission need not demonstrate irreparable harm

---

[94] Ex. 4, D'Antonio Decl. at ¶51(a).

or the unavailability of an adequate remedy at law.  *Hecht*, 321 U.S. at 331; *J.W. Korth*, 991 F.

Supp. at 1473.  Nor is it required to show a balance of equities in its favor.  *SEC v. U.S. Pension*

*Trust Corp.*, 07-22570-CIV-MARTINEZ, 2010 WL 3894082, *22 (S.D. Fla. Sept. 30, 2010) *aff'd*

*sub nom.*; *SEC v. U.S. Pension Trust Corp.*, 444 Fed. Appx. 435 (11th Cir. 2011).

The Commission's evidence in this case warrants entry of the requested injunctive relief

on all applicable grounds.  The declarations, account records, and other exhibits attached to this

motion demonstrate that Defendants are violating the anti-fraud and registration provisions of the

federal securities laws, and will continue to violate them if the Court does not immediately restrain

and enjoin them.

### B.    The SEC Has Established *Prima Facie* Violations of the Securities Laws

The Commission has met its burden of establishing a *prima facie* showing of violations of

the antifraud and registration provisions of the securities laws as alleged in the Complaint and this

motion.  As an initial matter, the alleged violations all require that the investment in question be a

"security" and that interstate commerce (or the mails) have been used.

### 1.    The Investor Agreements are Investment Contracts and are Therefore Securities Under *Howey*

The investor agreements constitute investment contracts and are therefore securities under

*SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).  Under the *Howey* test, an investment

contract exists if there is: (a) an investment of money; (b) in a common enterprise; (c) based on

the expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

*See SEC v. Friendly Power Company, LLC*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999).

The investor agreements satisfy all three elements of the *Howey* test.  First, investors

committed funds to participate in an investment opportunity.  *See SEC v. Unique Financial*

*Concepts, Inc.*, 119 F. Supp. 2d 1332, 1337 (S.D. Fla. 1998), *aff'd*, 196 F.3d 1195 (11th Cir.

1999) ("All that is required is that the investor give up some tangible and definable consideration."). Defendants marketed the investor agreements as an investment opportunity generating varying monthly returns, typically 10%, and raised between $70.9 million and $128.8 million from over 2,150 investors.

*Howey*'s common enterprise prong may be satisfied by either vertical or horizontal commonality. Vertical commonality exists where "the fortunes of investors are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." *Unique Financial*, 196 F.3d at 1199-1200 (internal quote omitted). Horizontal commonality exists where each investor's fortune is tied to the fortune of other investors by the pooling of interests or profits in the transaction. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

The Eleventh Circuit has held that "broad vertical commonality" is sufficient to satisfy *Howey*'s common enterprise element, finding it more "flexible" and less "stringent" than horizontal commonality. *Unique Financial*, 196 F.3d at 1200 n.4. Broad vertical commonality requires only a finding that investors' fortunes are linked to the efforts of the promoter or third parties. *Id*; *see also SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 732 (11th Cir. 2005).

Here, broad vertical commonality exists for two independent reasons. First, the fortunes of investors are entirely dependent on the efforts of Defendants to identify small and medium-sized businesses who can repay their merchant cash advances, plus the interest promised to investors. *See Unique Financial*, 196 F.3d at 1199-1200 (11th Cir. 1999) (finding commonality where defendant's clients "were not in a position to assume or maintain any substantial degree of control over their investment."). Investors do not vet or select the businesses they are purportedly funding with merchant cash advances; they are not even told their identities. The investor's role is limited to simply investing money into the venture. Second, Defendants operate the MJ

Companies as a Ponzi scheme by using new investor contributions to pay prior investors their purported principal and monthly interest.  The very nature of the alleged Ponzi scheme means investors are dependent on Defendants to secure new investors to cover the guaranteed return payments. *See Hays v. Adam*, 512 F.Supp.2d. 1330, 1337 (N.D. Ga. 2007) ("[T]he very nature of the Ponzi scheme meant that it was dependent on MBA attracting newer investors to cover the payments from Outdoor Media to earlier investors. Thus, the defendants cannot dispute that "the fortunes of the billboard purchasers were interwoven with and dependent upon the efforts and success' of Outdoor Media and MBA."); *see also ETS Payphones*, 408 F.3d at 732 (finding common enterprise where 99% of investors leased back phones to a company operated by promoter and were reliant on promoter to attract new investors to pay earlier ones).

The third *Howey* prong is met because investors were led to expect profits from the investor agreements based on the efforts of Defendants. Since *Howey*, the law has been clarified that profits need not be derived *solely* from the efforts of others. Instead, the inquiry is "whether the efforts made by others are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Unique Financial*, 196 F.3d at 1201.  Here, investors expected a return on their investment based on Defendants' efforts to identify, vet, and contract with businesses who would repay their principal with monthly interest returns.  Defendants marketed the investor agreements as investments in which they, rather than the investors, would do everything for the venture to succeed.

The MJ Companies' operation as a Ponzi scheme provides another basis for satisfying this third prong (as it does the second as discussed above).  The MJ Companies paid investors their purported profits from new investors' funds.  If Defendants did not find new investors, then the MJ Companies could no longer pay investors their profits.

## 2.    The Investor Agreements Also are Notes that Constitute Securities

The Supreme Court has held that every note is presumed to be a security unless it bears a strong resemblance to a judicially created list of non-security notes or the note is of a type that should be added to the list.[95] *Reves v. Ernst & Young*, 494 U.S. 56, 65, 67 (1990).   A "note" has been defined as "a certificate that evidences a promise to pay a specified sum of principal and interest to the payee at a specified time...." *Sanderson v. Roethenmund,* 682 F. Supp. 205, 206 (S.D.N.Y.1988) (finding that international certificates of deposit are "notes" under the securities laws).  That an instrument is not styled as a "note" is not dispositive. *See Fulton Bank v. McKittrick & Briggs Securities, Inc.*, 1990 WL 126179, at *4 (E.D. Pa. Aug. 27, 1990) ("although the instrument in question is labeled a 'certificate of participation,' it nonetheless bears all the earmarks of a note as that term is commonly understood."). *See also Holloway v. Peat, Marwick, Mitchell & Co.*, 879 F. 2d 772, 777 (10th Cir. 1989) (finding that passbook savings credit certificates and thrift certificates are "notes" under the securities laws, *vacated on other grounds*, 494 U.S. 1014 (1990), *and reaffirmed*, 900 F. 2d 1485 (10th Cir. 1990).

The Supreme Court has identified four factors to determine whether a note bears a "family resemblance" to notes that have been determined *not* to be securities:  (1) the motivation of the parties for entering the transaction; (2) the plan of distribution of the instrument and whether there is common trading for speculation or investment; (3) the reasonable expectations of investors; and

---

[95] The list of notes that are not securities includes: notes delivered in consumer financing; notes secured by a mortgage on a home or by a lien on a small business; notes evidencing a "character" loan to a bank customer or loans by commercial banks for current operations; and short-term notes secured by an assignment of accounts receivable or that formalize an open-account debt incurred in the ordinary course of business.

(4) whether there are risk-reducing factors that would make application of the securities laws unnecessary. *Reves*, 494 U.S at 66-67.

Applying these factors, the investor agreements, although not described as "notes", are indeed notes that constitute securities. As to the first *Reves* factor, the instrument is likely to be security if the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the instrument is expected to generate. Here, Defendants sold the investor agreements to raise money to be pooled and used to fund MJ Capital's and MJ Taxes' merchant cash advances business. In turn, investors purchased the MCA's from MJ Capital and MJ Taxes with the expectation of earning profits in the form of interest payments.

The second *Reves* factor looks to whether the investor agreements were "offered or sold to a broad segment of the public," and as such involved "common trading." *Id*. at 66. Here, Defendants sold the investor agreements to more than 2,150 investors residing in numerous states, and offered them to the general public.

The third *Reves* factor examines the reasonable expectations of the investing public. *Id.* The Supreme Court has "consistently identified the fundamental essence of a 'security' to be its character as an 'investment.'" *Id*. at 68-69. In this case, there can be no doubt that investors viewed the investor agreements as securities. Investors expected to receive interest payments, plus the return of their principal, from merchants using investor money to fund their business activities.

The final *Reves* factor asks whether some factor, such as the existence of another regulatory scheme, reduces the risk of the instrument, thereby rendering application of the securities laws

unnecessary. Here, no other regulatory scheme exists that would obviate the need to invoke the federal securities laws.

Accordingly, all of the *Reves* factors weigh in favor of finding that the investor agreements are notes that constitute securities.[96]

### 3.    Defendants Are Using Interstate Commerce

The interstate commerce requirement is satisfied by MJ Capital's and MJ Taxes' sale of the investor agreements to individuals in several states and their use of the Internet to solicit investors. *SEC v. Spinosa*, 2014 WL 2938487, *4 (S.D. Fla. June 30, 2014) (use of internet satisfied interstate commerce requirement).

### 4.    Defendants Are Violating Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act

Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5(a)-(c) of the Exchange Act prohibit essentially the same type of conduct. *United States v. Naftalin*, 441 U.S. 768, 773 n. 4 (1979); *Unique Financial*, 119 F. Supp. 2d at 1339. The language of these provisions is "expansive" and "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019). In *Lorenzo*, the Supreme Court recognized that there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and thus the same underlying conduct may establish a violation of more than one subsection.

---

[96] There is an exemption from Section 5 of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act (but not Section 17 of the Securities Act) for certain notes with a maturity of less than nine months. This exemption is unavailable to defendants because, among other reasons, the investor agreements are investment rather than commercial in character. *See SEC v. 1 Global Capital, LLC*, No. 18-cv-61991, 2019 WL 1670799, *7-8 (S.D. Fla. Feb. 8, 2019); *SEC v. Smart*, No. 2:09cv00224, 2011 WL 2297659, *13 (D. Utah June 8, 2011) (exemption applies only to "high quality instruments issued to fund current operations and sold only to highly sophisticated investors") (citation and quotation omitted), *aff'd* 678 F.3d 850 (10th Cir. 2012).

Section 17(a) of the Securities Act makes it unlawful in the "offer or sale" of securities to: (a) "employ any device, scheme, or artifice to defraud;" (b) "obtain money or property by means of any untrue statement of a material fact or any [material] omission;" or (c) "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1)-(3). A showing of scienter is required under Section 17(a)(1), but Sections 17(a)(2) and (a)(3) require only a showing of negligence. *Aaron v. SEC*, 446 U.S. 680, 697 (1980).

Section 10(b) of the Exchange Act and Rule 10b-5 render it unlawful, "in connection with the purchase or sale" of securities, to: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement or omission of material fact; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. A showing of scienter is required under Section 10(b) and Rule 10b-5 thereunder. *SEC v. Corporate Relations Group*, No. 6:99-cv-1222, 2003 WL 25570113 at *7 (M.D. Fla. Mar. 28, 2003).

Unlike private securities actions, the SEC need not prove reliance or injury under Section 17(a), Section 10(b), or Rule 10b-5. *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012).

### a.  Defendants' Misrepresentations and Omissions

Defendants told investors that their money would be used to fund MCAs and, in exchange, they would receive monthly interest payments and the return of their principal. *See* Ex. 5-7, 9-10, MCA contracts; Ex. 13, Anjdich Decl. at ¶¶ 9-14. To make the investments appear safe, Defendants touted that MJ Capital had a "team of underwriters" to ensure its clients could repay

the MCAs plus interest.  *See* Ex. 14, May 12, 2021 MJ Capital website capture at p. 15.  They also claimed that MJ Capital held liens on merchant projects.  *See* Ex. 13, Andjich Decl. at ¶15.

Investor proceeds were not used as promised.  Our analysis of the MJ Companies' bank records from June 1, 2020 through April 30, 2021 show that $70.8 million was deposited into the MJ Companies' bank accounts (excluding transfers from Garcia's personal accounts and intercompany transfers).  *See* D'Antonio Decl. at ¶11.  Of that amount, at least $51.1 million (or 72%) of the deposits came from investors, with possibly another $16.1 million (or 23%) from them.  *Id*. at ¶¶ 12(a), (b).  But only $115,725 (or 0.2%) of the deposits appear to come from possible MCA recipients.  *Id*. at ¶¶ 12(a), (g).

On the flip side, $62.1 million was withdrawn (excluding transfers to Garcia's personal accounts and intercompany transfers) from the MJ Companies' bank accounts during that same time period. *Id*. at ¶13.  Of that amount, Defendants used at least $20 million (or 32%), and possibly another $9.3 million, to pay investors what appear to be interest and principal payments, and at least $27.4 million (or 44%) to pay what appear to be sales agent commission.  *Id*. at ¶¶ 15(a), (b), (f).  Only $588,561 (or 1%) of the withdrawals appear to be payments to MCA recipients, with at most possibly another $2.3 million giving Defendants the benefit of the doubt.  *Id*. at ¶¶ 15(g), (h).

Based on the flow of funds in the MJ Companies' bank accounts, it is apparent that the funds used to pay investors their principal and interest were derived primarily from other investors' deposits.  For illustration, *see id*. at Ex. A, B, excerpted below.  It also is obvious that the MJ Companies' purported MCA business is really just a front for a growing Ponzi scheme.

**EXHIBIT A**



**MJ Accounts**
**Deposits by Category**
**June 1, 2020 - April 30, 2021**

Possible MCA Repayments,
Category D7
$115,725

Possible Sales Agents / Reps,
Category D6
$791,004

Tax Services,
Category D5
$616,670

Cash Deposits,
Category D4
$942,535

Short-Term Financing,
Category D3
$1,041,041

**Possible Investor Funds,**
**Category D2**
**$16,049,015**

Source: Wells Fargo and Chase Productions



**EXHIBIT B**

**MJ Accounts**
**Withdrawals by Category**
**June 1, 2020 - April 30, 2021**

Possible Payments to Investors, Category W2 $9,300,218

Cash Withdrawals, Category W9 $120,480

Buiness-Like Expenses, Category W8 $431,215

Other Recipients of Funds, Category W7 $2,320,881

Possible MCA Recipients, Category W6 $588,561

Short-Term Financing, Category W3 $746,697

Credit Card Payments, Category W4 $687,388

Source: Wells Fargo and Chase Productions

Not only did Defendants use investor funds to perpetuate the illusion of a successful business, but Defendants diverted a substantial portion of investor funds to pay sales agent commissions to the tune of $27.4 million and to repay loans owed by MJ Taxes in the amount of $746,697. *Id*. at ¶¶ 15(c), (f). Garcia also misappropriated investors funds by withdrawing $120,480 in cash. *Id*. at ¶¶15(i).

Additionally, Defendants' sham MCA business renders their statements about the security of the MCAs false and misleading. An MJ Capital representative told the UC that the company has liens on merchant's projects as security of repayment. *See* Ex. 13, Andjich Decl. at ¶15.

However, a nationwide search in the public records for UCC filings, liens and judgments did not reveal any liens held by MJ Capital or MJ Taxes. *Id.* at ¶19.

Under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), only the "maker" of a misstatement may be directly liable under Section 10(b) and Rule 10b-5(b).[97] "The maker" is "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 564 U.S. 135 at 142.  More than one person or entity may have authority over a statement and therefore may be considered the maker of a false statement or responsible for a material omission.[98]  Here, MJ Capital and its principal, Garcia, are the makers of the false statements and omissions in MJ Capital's investor agreements, on its website and social media, and in written materials.  MJ Taxes and its principal, Garcia, are the makers of the false statements and omissions in MJ Taxes' investor agreements, on its website and social media, and written materials.

### b.    The Misrepresentations and Omissions Were Material

A false statement or omission must be material for a defendant to be liable for it.  The test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action."  *SEC v. Merchant Capital, LLC*, 483 F.3d 747,

---

[97] *Janus* does not apply to Section 17(a) of the Securities Act or Rules 10b-5(a) or (c) of the Exchange Act.  *SEC v. Big Apple Consulting USA, Inc.,* 783 F.3d 786, 795-98 (11th Cir. 2015); *SEC v. Monterosso,* 756 F.3d 1326, 1334 (11th Cir. 2014).

[98] *City of Pontiac Gen. Employees' Retirement Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) (*Janus* "has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability.  It is not inconsistent with *Janus* to presume that multiple people in a single corporation have the joint authority" to "make" a misstatement); *see also In re Pfizer Inc. Secs. Litig.*, 936 F. Supp.2d 252, 268–69 (S.D.N.Y. 2013) (individuals liable for statements released by corporation), *vacated on other grounds*, 819 F.3d 642 (2d Cir. 2016).

766 (11th Cir. 2007) (citation omitted).   In other words, information is material if a reasonable investor would consider it significant to making an investment decision.  *Basic v. Levinson*, 485 U.S. 224, 230 (1988).

"Misrepresentations regarding the use of investors' funds are material."  *SEC v. LottoNet Operating Corp.*, 2017 WL 6949289, *13 (S.D. Fla. Mar. 31, 2017) (report and recommendation), *adopted* 2017 WL 6989148 (S.D. Fla. Apr. 6, 2017); *SEC v. Smart*, 678 F.3d.850, 857 (10th Cir. 2012) (the fact money was not being used as represented would be material to a reasonable investor).  False statements or omissions concerning a Ponzi scheme are material.  *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 492 (S.D.N.Y. 2002).  Misappropriation of funds by the issuer's principal are material.  *United States. v. Lochmiller*, 521 Fed. Appx. 687, 691-92 (10th Cir. Apr. 15, 2013) (upholding conspiracy to commit securities fraud conviction because, among other things, Defendant made material misrepresentations when he told investors he would use money for low-income housing but instead used it for personal gain) (cited in *Lottonet*, 2017 WL 6949289, *13).  The payment of commissions to sales agents is material as a matter of law. *SEC v. Alliance Leasing Corp.*, 2000 WL 35612001 at *8-9 (S.D. Cal. 2000), *aff'd* 28 Fed. Appx. 648, 652 (9th Cir. 2002) ("[T]he 30% commissions were 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality.'") (quoting *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)); *see Lottonet*, 2017 WL 6949289, *14 ("Any reasonable investor would want to know that Defendants were not, as Defendants represented, spending investor funds to develop the Company, but were instead using 35 percent of investors' money to pay sales agents for soliciting their investments.").

26

### c.   Defendants' Scheme to Defraud

Defendants perpetuated their scheme to defraud investors through their material misstatements and omissions discussed above. *See Lorenzo*, 139 S. Ct. at 1101-02 (knowing dissemination of misrepresentations with an intent to deceive violates Rule 10b-5(a) and (c) and Section 17(a)(1)); *see also Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019) (applying *Lorenzo* to Section 17(a)(3) because it "is virtually identical to Rule 10b-5(c)").

Their manipulation of the relevant bank accounts also allowed them to advance their scheme. Garcia controlled the MJ Companies' bank accounts and, in doing so, used investor funds to pay other investors so Defendants could keep the Ponzi scheme going. *See* Ex. 4, D'Antonio Decl. at ¶¶4(a)-(c), Ex. A, B. Defendants further misused investor funds to pay sales agent commissions and repay loans owed by MJ Taxes. *Id.* at ¶¶15(c), (f). Moreover, Garcia misappropriated investor funds through cash withdrawals. *Id.* at ¶¶15(i); *see also SEC v. Zanford*, 535 U.S. 813, 821-22 (2002) (misappropriation of client's securities for personal use states a claim for scheme to defraud).

### d.   Defendants Acted With Scienter

Scienter is a state of mind embracing intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The Commission may establish scienter for violations of Section 17(a)(1) of the Securities Act and Rule 10b-5 of the Exchange Act by "a showing of knowing misconduct or severe recklessness." *Monterosso*, 756 F.3d at 1335 (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982)). As noted above, Section 17(a)(2) and (3) of the Securities Act require a showing of negligence.

Garcia knew the representations to investors were false because she failed to use investor funds to finance merchant cash advances to small businesses as promised to investors. Instead,

through her control of the MJ Companies' bank accounts, she steered investor funds to pay principal and interest payments to other investors, made cash withdrawals on investor funds, and misspent investor funds on sales agent commissions and MJ Taxes loan repayments. *See* Ex. 4, D'Antonio Decl. at ¶¶4(a)-(c), 15(c), (f), (i),  Ex. A, B.  Garcia's scienter can be imputed to the MJ Companies. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1096 n.16 (2d Cir. 1972); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999) (finding that the scienter of corporate officers is properly imputed to the corporation).

### 4.       Defendants are Violating Section 5 of the Securities Act

Sections 5(a) and Section 5(c) of the Securities Act require that every offer and sale of securities must be either registered or validly exempted from registration.  To establish a *prima facie* case for a Section 5 violation, the Commission must prove that the defendant, directly or indirectly, (a) offered or sold a security; (b) using interstate commerce; while (c) no registration statement was filed or in effect as to the transaction. *SEC v. Calvo,* 378 F.3d 1211, 1214 (11th Cir. 2004).  The Commission is not required to prove scienter.  *Id*.  Once the Commission has established a *prima facie* case, the burden of proof shifts to the defendant to show that an exemption or safe harbor from registration is available for the offer or sale of the security. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).

Defendants are violating this provision because the MJ Companies offering is not registered and no exemption from registration is in effect. *See* **Exhibit "25,"** SEC attestation for MJ Capital, and **Exhibit "26,"** SEC attestation for MJ Taxes.  The exemptions from registration pursuant to Section 4(a)(2) of the Securities Act and Rules 504, 505, and 506(b) of Regulation D thereunder were unavailable to the MJ Companies for the sale of their securities because of the general solicitation by Defendants through their website and social media platforms where they advertised their MCA business and investors' ability to make money through their investments

with the MJ Companies.  *See* Ex. 13, Andjich Decl. at ¶¶9-14.  Rule 504 was also unavailable

because more than $5 million of securities were sold in a 12-month period in the offering.  *See* Ex.

4, D'Antonio Decl. at ¶12(a).

The intrastate offering exemptions of 3(a)(11), Rule 147, and Rule 147A are likewise not

available because Defendants sold the securities in several states.  *See* Ex. 2, Garcia. Decl. at ¶3.

Furthermore, the exemption under Rule 506(c) is unavailable because there is no indication

that Defendants took reasonable steps to verify that investors were accredited.  This exemption

from registration requires both that "all purchasers of securities sold [pursuant to this exemption]

…are accredited investors" and, separately, that issuers "take reasonable steps to verify that the

purchasers of the securities are accredited investors."  Rule 506(c) of Regulation D, 17 C.F.R. §

230.506(c).  As a result, and as the Commission explicitly indicated in its adoption of Rule 506(c),

the exemption is not satisfied if reasonable steps to verify are not taken, even if all investors happen

to be accredited.  *See Eliminating the Prohibition Against General Solicitation and General*

*Advertising in Rule 506 and Rule 144A, Rel. No.* 33-9415, at 26 and n.101 (Jul. 10, 2013) (adopting

release) (explaining that the two requirements are separate and independent and that treating them

as such will avoid diminishing the incentive for issuers to undertake the reasonable verification

steps envisioned by the statute).

No other exemption from registration was available for the MJ Companies offering.

**C.**     **Disgorgement is an Appropriate Remedy Against Defendants**

Disgorgement is warranted because Defendants unlawfully received between $70.9 million

and $128.8 million from investors as part of their ongoing Ponzi scheme.  *See* Ex. 4, D'Antonio

Decl. at ¶¶12(a), 51(a).  Disgorgement is designed to deprive a wrongdoer of unjust enrichment,

and thereby reflect the "foundational" principle of equity that a wrongdoer "should not profit by

his own wrong." *Liu v. SEC*, 140 S. Ct. 1936 1941, 1943 (2020). A court may order disgorgement "that does not exceed a wrongdoer's net profits and is awarded for victims." 140 S. Ct. at 1940.

"Reasonable approximation[s] of the defendant[s'] unlawfully acquired assets. . . shift[] [the burden] to the defendants to demonstrate the SEC's estimate is not reasonable." *SEC v. Monterosso,* 756 F.3d 1326, 1337 (11th Cir. 2014); *accord SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017). The Commission need not trace a defendant's ill-gotten gains to assets currently possessed. *See FTC v. Leshin*, 719 F.3d 1227, 1234 (11th Cir. 2013) ("[A] disgorgement order establishes a personal liability, which the defendant must satisfy regardless whether he retains the proceeds of his wrongdoing.") (citation and quotation omitted); *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1369 (S.D. Fla. 2006) ("[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset . . . .") (citation and quotation omitted), *aff'd*, 240 F. App'x 355 (11th Cir. 2007).

## D.    A Total Asset Freeze is Appropriate

The Court may order an asset freeze to ensure that a disgorgement award can be satisfied and to prevent further dissipation of investor funds. *SEC v. ETS Payphones, Inc.,* 408 F.3d 727, 734 (11th Cir. 2005); *accord CFTC v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2008). "The SEC's burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light:   a reasonable approximation of a defendant's ill-gotten gains is required. Exactitude is not . . . ." *ETS Payphones*, 408 F.3d at 735 (citation, quotation, and alteration omitted); *accord FTC v. IAB Marketing Associates, LP.,* 746 F.3d 1228, 1234 (11th Cir. 2014). The Commission's burden to demonstrate the potential for dissipation of funds is even lighter. *See FTC v. IAB Marketing Associates, LP,* 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013) ("There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze.") (citing *ETS Payphones,* 408 F.3d at 734, and *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1367,

August 9, 2021                        Respectfully submitted,

                             By:    /s/
                                    Stephanie N. Moot
                                    Senior Trial Counsel
                                    Fla. Bar No. 30377
                                    Direct Dial: (305) 982-6313
                                    Email: moots@sec.gov

                                    Andrew O. Schiff
                                    Regional Trial Counsel
                                    S.D. Fla. No. A5501900
                                    Direct Dial: (305) 982-6390
                                    Email: schiffa@sec.gov

                                    Raynette R. Nicoleau
                                    Fla. Bar No. 278210
                                    Senior Counsel
                                    Direct Dial: (305) 982-6308
                                    Fax: (305) 536-4154

                                    Attorneys for Plaintiff
                                    **SECURITIES AND EXCHANGE**
                                    **COMMISSION**
                                    801 Brickell Avenue, Suite 1950
                                    Miami, Florida 33131
                                    Telephone: (305) 982-6300
                                    Facsimile: (305) 536-4146